UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

CODUS J. McKARR,

                    Plaintiff,          Case No.: 12-cv-10842
                                              Honorable Victoria A. Roberts
            v.                          Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                    Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 16, 17]**

Plaintiff Codus McKarr, proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.      RECOMMENDATION**

For the reasons set forth below, the court finds that substantial evidence supports the ALJ's decision that McKarr was not disabled. Accordingly, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [16] be GRANTED, McKarr's motions [13, 17] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

**II.     REPORT**

   **A.     Procedural History**

On July 24, 2003, McKarr filed an application for SSI, alleging disability since May 28, 2003.  (Tr. 59).  His claim was denied initially on October 29, 2003 and he timely filed for a hearing before an administrative law judge ("ALJ"), which occurred on October 4, 2005.  (*Id.*). McKarr, proceeding *pro se*, testified at the hearing, as did vocational expert ("VE") Raymond Duleki.  (*Id.*).  On January 26, 2006, the ALJ found that McKarr was not disabled because he was capable of work at all exertional levels with the nonexertional limitation of needing ready access to a bathroom.  (Tr. 59-66).  On May 17, 2006, the Appeals Council denied review of McKarr's claim.  (Tr. 67-69).  McKarr did not appeal this decision.

On September 18, 2009, McKarr filed applications for DIB and SSI, alleging disability as of December 31, 2008.  (Tr. 102-108).  The claims were denied initially on December 11, 2009. (Tr. 54-55; 72-75).  Thereafter, McKarr filed a timely request for an administrative hearing, which was held on January 31, 2011, before ALJ Patrick J. MacLean.  (Tr. 23-53).  McKarr, appearing *pro se*, testified, as did VE Diane Regan.  (*Id.*).  On February 24, 2011, the ALJ found that McKarr's condition had increased in severity since the date of the prior ALJ decision, and added additional nonexertional limitations into his residual functional capacity ("RFC") assessment.  (Tr. 8-22).  However, he ultimately found McKarr not disabled.  (*Id.*).  On December 20, 2011, the Appeals Council denied review.  (Tr. 1-5).  McKarr filed for judicial review of the final decision on February 24, 2012 [1].

   **B.     Background**

      *1.     Disability Reports*

In an undated disability report, McKarr reported that the condition preventing him from

2

working was a "prostate problem." (Tr. 153). This condition caused him to have to go to the bathroom "too often." (*Id.*). He reported working after his alleged onset date, but only part-time, and reported that he was no longer working because "[t]hey did not have a per[m]anent job and they were waisting [sic] my time giving me just a few hours." (Tr. 154). He reported that his previous jobs had been as a general laborer, a laborer and a security guard. (*Id.*). McKarr reported seeing no doctors, taking no medications and receiving no tests for his condition. (Tr. 156-57).

In an October 1, 2009 disability field office report, the interviewer noted that McKarr stated that he was incontinent, but did not appear to have a problem while waiting for, or during, his interview with the interviewer. (Tr. 143).

In an October 16, 2009 function report, McKarr reported that he lived alone in an apartment and that he stays around home due to a frequent need to use the bathroom to urinate. (Tr. 145). He reported that he cares for no one because of his condition and that while he does work, it "embarrasses" him that he urinates so often. (Tr. 146). He reported interrupted sleep at night due to his condition, which occurs as soon as he drinks water. (*Id.*). He consistently reported needing to be near a restroom. (Tr. 147). He reported that he is able to prepare his meals, can do "indoor work very well," goes outside to attend church, can drive a car and go out alone, and can shop for personal items and food "anytime I want to." (Tr. 147-48). He reported that his hobbies included reading the Bible and attending church, and that he attended services every Sunday. (Tr. 149). He reported no longer being able to play soccer because of his condition. (Tr. 150). McKarr reported having trouble lifting, standing and kneeling due to his condition, as those activities increase his need to urinate. (*Id.*). He reported no troubles paying attention, getting along with others or following instructions, other than the fact that his need to

frequent the restroom interfered with his job and caused other people to question why he was going to the bathroom so often. (Tr. 150-51). McKarr reported that "sometimes the Flomax will help me." (Tr. 152).

In an undated disability appeals report, McKarr reported that his condition had worsened in that he now goes to the bathroom more often than before. (Tr. 171). He reported this change occurred on December 11, 2009. (*Id.*). He reported having been treated by two doctors since his last report and taking Flomax for his condition. (Tr. 172-73). He reported that his condition affects his ability to care for himself because he "go[es] to the bathroom too frequently." (Tr. 174).

In a July 26, 2010 recent medical treatment form, McKarr reported that his doctors had informed him that he has an enlarged prostate and that he does not have medical insurance to see a doctor. (Tr. 177). In a medications report filed the same day, McKarr noted that he wanted earlier retirement and medical insurance in order to see a doctor for his condition, which he reported as getting worse. (Tr. 180). In a subsequent recent medical treatment form filed on December 10, 2010, McKarr stated that his doctors told him he would be on medication "for life time [sic]," and that he had been unable to work for the last two years. (Tr. 183).

### 2. *Plaintiff's Testimony*

McKarr testified at the hearing that he cannot work due to his urinary condition which causes him to have to frequent the restroom often and sometimes causes him to urinate in his pants, resulting in embarrassment to himself and his employers. (Tr. 29). He testified that he does not sleep much due to his condition. (*Id.*). McKarr testified that he lives alone, that he does not cook because he does not have time, and that someone from the church delivers groceries to him. (Tr. 34). He testified that he eats "soft foods, oat foods." (*Id.*). He testified that his

4

girlfriend cleans his house and does his laundry. (Tr. 35). McKarr testified that he is a student at ITT Technical Institute and that he attends school three days a week from 9:00 a.m. until 1:30 p.m. (Tr. 35-37). He testified that he usually drives to school, but sometimes takes the bus, and that it takes him 20-35 minutes to get to school. (Tr. 36-37). He testified that he takes three breaks during the school day. (Tr. 37).

McKarr testified that he arrived at the hearing about three hours early and had to go to the bathroom more than six times during that period. (Tr. 41-42). He testified that he does not sleep because of his condition and that while he had previously been on Flomax, it did not help, and caused black spots on his neck. (Tr. 42). He also testified that his doctor talked to him about an operation, but advised that it did not work well and it was not a good option for him. (*Id.*). He testified that there is no device he could use to prevent him from needing to urinate so frequently, and that he sometimes urinates in a cup when he cannot get to a restroom. (Tr. 42-43). He testified that he stopped working at his last job as a security guard because there were too many questions being asked about his frequent need to go to the bathroom. (Tr. 43). He testified that when he goes to the restroom, it generally takes him two to three minutes each time. (Tr. 47).

At the beginning of the hearing, McKarr asked the ALJ how he would feel if, while performing his duties as a judge, he had to get up every few minutes to use the restroom. (Tr. 30-31. The ALJ found this question to be inappropriate and declined to answer, stating that the question did not go to McKarr's disability and was not appropriate. (Tr. 31-32). McKarr protested, arguing that he had a right to ask questions. (*Id.*). The ALJ was patient, but eventually he advised McKarr that he would have to call security if McKarr continued to disrupt the hearing. McKarr asserted that he would sue if he were thrown out of the hearing. (Tr. 32-33). Ultimately, the hearing continued after this incident. (Tr. 33-53).

5

*3.     Medical Evidence*

There is very little medical evidence in the file, and some of it pertains to other conditions the ALJ did not find severe. Because McKarr does not challenge the ALJ's finding that those other conditions were not severe, the court will only discuss the medical evidence as it pertains to his prostate problem.

*a.     Treating Sources*

On October 1, 2008, McKarr was treated in the emergency room for frequent urination. (Tr. 189). He reported that he had previously been on Flomax, which helped him, but that his doctor had switched him to Ditropan because his insurance was not covering the Flomax. (*Id.*). He reported that he "had no problems when he has been on it, only when he came off of it." (Tr. 192). McKarr reported that he had developed "marked urinary frequency," going to the bathroom "every 15 minutes." (Tr. 189). He reported that he had an upcoming appointment with the urology clinic. (*Id.*). A review of his medical records by the emergency room physician revealed that he was found by his urologist to have a slightly enlarged prostate, a small capacity bladder and inflammatory polyps in the prostatic urethra. (Tr. 190). He was told by his pharmacist that if a doctor wrote a prescription for Flomax, his insurance would cover it, and he requested a prescription from the emergency room doctor, who wrote one. (Tr. 198-90). He denied "any change in his symptoms right now [other] than what happened in the past." (Tr. 189). An Accu-Check and a urinalysis test were normal and unremarkable. (Tr. 190). There are no records in the file from the alleged urologist appointment McKarr was noted to have scheduled.

McKarr was treated approximately five times by his primary care physician between April and November 2009. (Tr. 206-220). Only once, on April 20, 2009, did the doctor note a

6

complaint of frequent urination and a history of BPH. (Tr. 208-11). However, his primary complaint on that day dealt with pain in his back, neck and bilateral shoulders. (Tr. 208). At his subsequent appointments on June 15, 2009, August 24, 2009, September 21, 2009, and November 19, 2009, there were no complaints related to McKarr's prostate or urinary problems. (Tr. 206-207).

### b. Consultative and Non-Examining Sources

On November 16, 2009, McKarr was examined by Dr. P. Shah, a consultative examiner, for the state of Michigan. (Tr. 196-98). McKarr reported a six-year history of frequent urination requiring him to get up five to six times a night to urinate, and, at times, hesitancy and dysuria. (Tr. 196). He reported an enlarged prostate and that he was taking Flomax which helped some, but not all of, the time. (*Id.*). He reported no incontinence and no erectile dysfunction. (Tr. 197). Dr. Shah noted no notable abnormalities in any of the vital systems examined, however it does not appear McKarr's urinary system was examined. (Tr. 197-98). Dr. Shaw concluded that McKarr "appears to have prostatic hypertrophy and increased frequency of urination especially at night with disturbed sleep." (Tr. 198). He found that it would be helpful if McKarr saw a urologist for management of his condition, but that he was "otherwise ambulatory." (*Id.*).

A case analysis performed by Dr. Timothy Bessent found that there was not sufficient evidence in the record to conclude that McKarr's condition was severe in that it did not "interfere with his ability to engage in [substantial gainful activity]." (Tr. 222).

### 4. Vocational Expert's Testimony

VE Regan testified that McKarr's prior work as a general laborer was unskilled and of medium exertion, and his work as a security guard was semi-skilled and of light exertion. (Tr. 46). The ALJ then asked the VE to imagine a hypothetical person of McKarr's age, education,

vocational background who had no exertional limitations but required the ability to use the restroom two to three times an hour for approximately two to three minutes each time. (Tr. 46-47). He asked whether such a person could perform McKarr's prior work. The VE testified that such a person could perform McKarr's work as a general laborer, but not his work as a security guard. (Tr. 47). The ALJ then asked whether there were other jobs in significant numbers in the national economy that such an individual could perform. (Tr. 48). The VE testified that such a person could perform the jobs of packer (8,000 jobs in the regional economy) and a punch press operator (8,000 jobs), both of which were at the medium exertional level and were unskilled. (Tr. 48). The ALJ then asked whether employment would be eliminated if the same individual had to be off-task for 30 percent of the work day, and the VE testified that it would be. (Tr. 48-49). Finally, the ALJ asked if exceeding the customary limitations of a half-hour for lunch, two 15-minute breaks and no more than two absences a month would eliminate employment, and the VE testified that it would. (Tr. 49).

McKarr got agitated throughout the VE's testimony, apparently frustrated that, although he had been trained as an engineer and was in school studying computers, the VE was being questioned about his ability to perform "general laborer" work. (Tr. 47; 49-52). He intimated that such an assumption was "degrading" as he was part of a "high-tech profession." (Tr. 50). He also intimated that someone with his condition could not perform a job as a laborer when he had to go to the bathroom all the time. (Tr. 51). However, he did not ask the VE a hypothetical question about his limitations. (Tr. 47-52).

  **C. Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant

8

part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

9

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found McKarr not disabled. At Step One he found that McKarr had not engaged in substantial gainful activity since his alleged onset date despite having worked temporarily part-time during that period. (Tr. 14). At Step Two, the ALJ found McKarr suffered from the serious impairment of benign prostatic hypertrophy (enlarged prostate). (*Id.*). This was despite the fact that the medical examiner originally found McKarr's condition to not be severe. (Tr. 17). At Step Three the ALJ determined that all of McKarr's conditions, either alone or in combination, did not meet or medically equal a listed impairment. (Tr. 14-15). The ALJ next assessed McKarr's residual functional capacity ("RFC"). He determined that he was not bound by the RFC assessment made by the previous ALJ because the record revealed "increased severity" of McKarr's condition since the prior hearing. (Tr. 11). He found McKarr capable of performing "a full range of work at all exertional levels but with the following nonexertional limitations: the claimant requires work near a bathroom, and the ability to take two to three bathroom breaks per hour, each lasting approximately two to three minutes." (Tr. 15). At Step Four the ALJ determined that based on McKarr's RFC, he was capable of returning to his prior work as a general laborer. (Tr. 17). Alternatively, the ALJ proceeded to Step Five and found that based on McKarr's age, education, vocational experience and RFC, there existed a significant number of jobs in the national economy that McKarr could perform. Thus, he was not disabled. (Tr. 189-90).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the

10

Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence

11

submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F. Analysis

McKarr's motion, styled in the form of a letter, essentially argues that the ALJ erred in concluding that there was not sufficient evidence to find him disabled based on his prostate condition. He also argues that the ALJ was biased against him due to his attempt to ask the ALJ how he would feel if he were in McKarr's position, resulting in the verbal confrontation described above. *Supra* at 5.

#### 1. *Substantial Evidence*

The court finds that substantial evidence supports the ALJ's decision. The ALJ carefully evaluated the scant medical evidence in this case, and gave McKarr the generous benefit of not only finding that his prostate condition was severe, but finding that it created the nonexertional limitations of needing close access to a restroom and needing to use that restroom two to three times an hour for two to three minutes each time. Moreover, the ALJ made this finding despite noting that McKarr did not ask to use the restroom once during the 40 minute hearing, and the fact that a social security interviewer also found that McKarr had had no trouble while waiting for, or during, his initial interview. (Tr. 16).

The ALJ noted the lack of objective medical evidence of McKarr's condition outside of his own self reports to his primary care physician and the emergency room doctor. (*Id.*). He also noted that McKarr's testimony was not fully credible, as his testimony about the ineffectiveness

of Flomax contradicted his earlier self-reports and reports to the emergency room doctor that Flomax was working and that he discontinued it for insurance reasons. (*Id.*). The ALJ noted McKarr was also inconsistent in the frequency of his need to go to the restroom, sometimes alleging he had to go every five minutes, other times alleging it was ten. (*Id.*). At the same time, McKarr testified that he attended school four and a half hours a day three days a week with only three breaks during that time. (Tr. 17). He also drove up to 35 minutes to school. (*Id.*). The ALJ also noted that McKarr did not need to use the restroom during the 40-minute hearing. (Tr. 16). Finally, the ALJ noted that McKarr's testimony, that he was not capable of performing his prior work, appeared to stem not from his prostate condition, but from his belief that such work was degrading given his training in computers. (Tr. 17). But as the ALJ properly ruled (Tr. 17-19), the salient question here is whether McKarr could perform his "past relevant work" or "other work [] in the national economy," *supra* at 9, not whether he could perform the most challenging or lucrative work for which he might otherwise be qualified.

Finally, McKarr argues, "Where in the world will any employer hire me will [sic] a bladder problem to take a bath room break whenever I want …" (Doc. #17). However, in opining on McKarr's ability to perform his prior work and other work in the national economy, the VE specifically contemplated a person with the limitations that the ALJ found to be credible – *i.e.*, an individual who requires two to three bathroom breaks an hour for approximately two to three minutes each time. *Supra* at 8. McKarr presented no evidence to rebut the VE's sworn testimony regarding the available work for somebody with such limitations.

In sum, the court finds that the ALJ fully reviewed all of the record evidence, properly assessed McKarr's credibility, and correctly determined that McKarr was not disabled. Substantial evidence supports the ALJ's conclusion.

### 2. *ALJ Bias*

The court finds that McKarr's argument that the ALJ was biased against him is without merit. In evaluating McKarr's claim, this court begins with the "presumption that policymakers with decisionmaking power exercise their power with honesty and integrity." *Navistar Int'l. Transportation Corp. v. United States Environmental Protection Agency*, 941 F.2d 1339, 1360 (6th Cir. 1991). "The burden of overcoming the presumption of impartiality rests on the party making the assertion [of bias], 'and the presumption can be overcome only with convincing evidence that a risk of actual bias or prejudgment' is present." *Id.* (citing *Schweiker v. McClure*, 456 U.S. 188, 196 (1982); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

In *Wells v. Apfel*, 2000 U.S. App. LEXIS 26163 (6th Cir. Oct. 12, 2000), the plaintiff alleged bias on the part of an ALJ based on the ALJ's "unwarranted skepticism" toward the plaintiff as well as alleged improper behavior during the hearing, including the ALJ's allegedly demeaning and discourteous manner towards the plaintiff and his counsel. The Sixth Circuit rejected this argument, concluding that the ALJ's frustration, emotional mannerisms and abruptness were insufficient to establish actual bias. *Id.*

As noted above, here the court finds that the ALJ thoroughly assessed McKarr's case and gave him the benefit of the doubt on the severity of his condition despite the sheer lack of objective medical evidence in support of that finding. To the extent the ALJ exhibited any frustration at the hearing related to McKarr's questioning it does not constitute bias where, despite this interaction, he continued the hearing, gave McKarr the opportunity to testify fully, and gave him the opportunity to question the VE. *Wells*, 2000 U.S. App. LEXIS 26163; (*See also generally* Tr. 25-53). Furthermore, the court has carefully reviewed the transcript, and finds that the ALJ treated McKarr with respect and indulgence, and conducted the hearing in an

unbiased and appropriate manner.[1]

For all of the above reasons, the court finds that the ALJ properly concluded that McKarr was not disabled under the Act, and his decision is supported by substantial evidence in the record.

### III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that McKarr's Motions for Summary Judgment [13, 17] be DENIED, the Commissioner's Motion [16] be GRANTED and this case be AFFIRMED.

Dated: October 10, 2012  
Ann Arbor, Michigan

s/David R. Grand  
DAVID R. GRAND  
United States Magistrate Judge

---

[1] Indeed, it was McKarr's demeanor during the hearing that was often less than cordial, and at times downright hostile. For example, when the ALJ noted that it was sometimes difficult to understand what McKarr was saying due to his accent, McKarr argued that everyone has an accent and he then accused the ALJ of: (1) not listening to him, and (2) understanding his answers fine, yet asking for clarification as a pretext for some other purpose. (Tr. 38; 40-41). When asked where he was from originally and if he went to school in this country, McKarr refused to answer the ALJ's questions except to say that he was currently a student at ITT. (Tr. 39-40). McKarr argued that since he was a U.S. citizen these background questions were not appropriate. (*Id.*). When the ALJ included in his hypothetical to the VE that he assumed McKarr did not attend primary or secondary school in the United States, McKarr interjected: "What makes you say I didn't go to school here? What makes you say that?" (Tr. 46). The court notes that McKarr had previously testified that he was born in 1958, but had only been in the United States for 13 years as of the 2011 hearing, which clearly suggests that he did not attend primary or secondary school in the United States. (Tr. 33, 38). When informed that the VE would testify, McKarr argued that he did not want any questions from a vocational expert because he was a student (apparently concluding mistakenly that the VE would ask questions of him and that the VE's testimony was not applicable because he was not currently working). (Tr. 44). When the VE testified that McKarr could perform his prior work as a general laborer, McKarr proceeded to ask her whether she, as a college educated person, should have to work as a general laborer, stating in part: "Can I, can I degrade you, degrade you now? Can you do a laborer job now, and sick? Can I, can I offer you a laborer job and sweep in front of my house?" (Tr. 51).

15

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 10, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager
